### PARKER RUST-PROOF CO. *v.* ALLEN.

**1. MASTER AND SERVANT—PATENTS—ESTOPPEL.**

. Where an employee had agreed to assign to his employer any patent which might be issued to him in protection of his employer's business of rust-proofing metals, and he called his employer's attention to a patent for a rusticide process, but the employer gave him to understand that it did not want it, and he thereafter entered into engagements with others, the employer is estopped from thereafter insisting that said patent be assigned to it.[1]

**2. SAME—PATENTS OBTAINED BY EMPLOYEE BELONG TO EMPLOYER UNDER CONTRACT OF HIRING.**

Where an employee agreed to assign to his employer patents issued to him in protection of his employer's business, patents which were issued to him while he was so employed belong to his employer, and equity will compel their assignment to it in accordance with the agreement.[2] BIRD and MOORE, JJ., dissenting.

Appeal from Wayne; Driscoll (George O.), J., presiding. Submitted December 4, 1924. (Docket No. 137.) Decided May 14, 1925.

Bill by the Parker Rust-Proof Company against William H. Allen to compel the assignment to plaintiff of certain letters patent. Defendant filed a cross-bill asking affirmative relief. From a decree dismissing the bill and granting the prayer of the cross-bill, plaintiff appeals. Reversed, in part, and decree entered.

*Angell, Turner & Dyer,* for plaintiff.

*James M. Cleary (Frank C. Sibley,* of counsel), for defendant.

---

[1]Master and Servant, 26 Cyc. p. 1021; [2]Id., 26 Cyc. p. 1021.

On rights of employer and employee with respect to things produced by labor of employee, see note in 5 L. R. A. (N. S.) 1154.

On right to inventions as between employer and employee, see notes in 16 A. L. R. 1177; 32 A. L. R. 1037.

MOORE, J. (*dissenting*). The bill of complaint is filed in this case to compel defendant to assign to plaintiff certain patents. Defendant filed an answer in the nature of a cross-bill asking for affirmative relief. The bill of complaint was dismissed and a decree granting the relief prayed in the cross-bill was granted. The case is brought into this court by the plaintiff on appeal.

The bill of complaint was filed April 4, 1923. The plaintiff company was organized August 23, 1915. It succeeded Mr. Clark W. Parker who was made its first president. We quote some correspondence that is important:

"(Letter from Clark W. Parker to defendant dated May 18, 1915.)

"May 18, 1915.

"Mr. W. H. ALLEN,
     "234 Hubbard Ave.,
     "Detroit, Mich.

"*Dear Sir:* In consideration of your having assigned to me your invention and improvement in rust-proofing of metals, and also of the future assignment to me of any further inventions and improvements you may have or may hereinafter make in the process of rust-proofing, I agree to pay you a salary of not less than $15.00 per week so long as you may assist me in this matter. This is with the understanding that I will increase your weekly salary as soon as the profits of this business will warrant me doing so, and further if the business of the Parker Rust-Proof Company develops into a paying business as a result of your efforts, I will see that a further remuneration is given you. The amount and character of this additional remuneration is to be decided by me and I will decide in accordance to the success of the business to which your efforts may have to do with.

"Trusting that this is according to our understanding and is satisfactory to you, I remain,

"Yours very truly,

"CWP/EE."

Assignment dated October 23, 1915.

"Clark W. Parker to Parker Rust-Proof Co.

"For and in consideration of the sum of one dollar to me in hand paid, and in further consideration of an amount of the capital stock of the Parker Rust-Proof Company of America, a corporation of the State of Michigan, having par value of the sum of fifty thousand dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, I, Clark Warner Parker, of Detroit, Wayne county, Michigan, do hereby sell, assign and transfer unto said Parker Rust-Proof Company of America, the entire right, title and interest in and to certain new and useful improvements in processes for rust-proofing iron and steel invented by William H. Allen. * * *

"And I, the said Clark Warner Parker, hereby agree and bind myself, in consideration of the above premises, to pay over, transmit and render to said Parker Rust-Proof Company of America, immediately upon receipt thereof, all incomes and receipts of whatever character arising out of or derived from said contract with the Richards Anti-Rust (foreign patents) Limited, or the said power-of-attorney from the said Frank Rupert Granville Richards, of the said letters patent number 1,069,903 immediately upon the receipt thereof, together with all claim, contracts and agreements relating to the rust-proofing of iron and steel.

"And I, the said Clark Warner Parker, do hereby constitute myself trustee for the said Parker Rust-Proof Company of America, in all matters pertaining to the premises above set forth, binding myself to account to said corporation for all properties, effects, rights and privileges now vested in me, pertaining to the rust-proofing of iron and steel.

"In testimony whereof I have hereunto set my hand and affixed my seal this 23rd day of October, 1915.
                    (Signed)     "CLARK W. PARKER."

The defendant did not answer the letter of May 18, 1915, but entered into the employ of Mr. Parker, and later the plaintiff company. He also continued to be a professor in the college of pharmacy in the Detroit Institute of Technology, with which college he had been since 1891. When defendant came to the plaintiff he claims he was employed to perfect

processes they were then using, known as a "hot process" and that he took out several patents along that line, which were duly assigned by him to the plaintiff company. It is also his claim here that the patents in controversy relate to an entirely different process which does not require heat.

There appears in the record the following paper:

"William H. Allen to Parker Rust-Proof Co.

"For and in consideration of being employed as consulting chemist by the Parker Rust-Proof Company of America, a corporation of the State of Michigan, having its principal office and place of business at Detroit, Michigan, and in consideration of the salary received by me from said Parker Rust-Proof Company of America, and in consideration of the issuance to me of an amount of the capital stock of said Parker Rust-Proof Company of America having a par value of five thousand dollars ($5,000), I, William H. Allen, of Detroit, Michigan, hereby sell, assign and convey to said Parker Rust-Proof Company of America, all of my right, title and interest in and to two applications for letters patent of the United States, for new and useful improvements in processes for rust-proofing iron and steel. * * *

"And, I, the said William H. Allen, hereby agree that I will assign to said Parker Rust-Proof Company of America, exclusively, all rights to employ and use any inventions that I may hereafter make while in its employ, in the rust-proofing of iron and steel, and I further agree to execute all applications for patents, assignments and licenses necessary to carry this present instrument and the contract expressed herein into effect, when requested by and at the expense of said Parker Rust-Proof Company of America.

"In testimony whereof, I have hereunto set my hand and affixed my seal this 6th day of December, 1915.

(Signed) "WILLIAM H. ALLEN (Seal)"

Mr. Allen testified that he did not read this paper, nor was it read to him; that he was assured by Mr. Parker that it was simply the assignment of two patents, and that he relied upon the statement of Mr. Parker. The latter was not called as a witness and

had severed his connection with the company as will appear later.

In this connection the following, written by the secretary and treasurer of the company, may be of interest:

"(Letter from Mr. Cornelius to defendant, dated March 15, 1921.)

"March 15, 1921.

"Mr. W. H. ALLEN,
"Office.

"*Dear Professor:* In accordance with your request I herewith submit to you the following information relative to your employment by the Parker Rust-Proof Company.

"On May 9, 1915, Mr. C. W. Parker made the following arrangement with you which was in the form of a letter from Mr. Parker to you:

" 'In consideration of your having assigned to me your invention and improvement in rust-proofing of metals, and also of the future assignment to me of any further inventions and improvements you may have or may hereinafter make in the process of rust-proofing, I agree to pay you a salary of not less than $15 per week so long as you may assist me in this matter. This is with the understanding that I will increase your weekly salary as soon as the profits of this business will warrant me doing so, and further if the business of the Parker Rust-Proof Company develops into a paying business as a result of your efforts, I will see that a further remuneration is given you, the amount and character of this additional remuneration is to be decided by me and I will decide in accordance to the success of the business to which your efforts may have to do with.

" 'Trusting that this is according to our understanding, and is satisfactory to you, I remain.'

"On August 23, 1915, the Parker Rust-Proof Company was incorporated and on August 24, 1915, you were placed on the pay roll at $15 per week. It would therefore seem that prior to the incorporation of the company you were in the employ of Mr. C. W. Parker. On October 6, 1915, the company issued to you certificate No. 5 for 50 shares of its common stock of the par value of $5,000. At this time it was arranged that you were to receive from stock that

was issued to C. W. Parker for patents 200 additional shares of the par value of $20,000. On October 23, 1915, Mr. C. W. Parker assigned to the Parker Rust-Proof Company all his rights under the agreement he made with you under the date of May 8, 1915, above referred to. On September 17, 1918, the company issued to you certificate No. 1279 for 200 shares of its common stock of the par value of $20,000 which was in fulfillment of the arrangement that was made with you on October 6, 1915, at the time the 50 shares were issued."

It will be noticed that there is no reference to the agreement of December 6, 1915. Perhaps this may be explained by testimony to the effect that the paper did not appear with the contracts of the company, but was found with the patent files of the company, whether with those mentioned in the paper itself does not appear.

Under date of January 23, 1917, the following appears on the minute books of the company:

"The president announced that he had appointed William H. Allen as chief chemist of this corporation for the ensuing year at a salary of $3,900 a year, payable in twenty-four equal instalments, on the 1st and 15th of each month. The appointment of Mr. Allen as chief chemist was duly approved."

That is all that is said about the employment of Professor Allen at that time or anywhere in the minute books of the company.

The following appears in the testimony of the secretary and treasurer of the company:

"Mr. Allen was employed August 24, 1915, at $15 a week. On November 19, 1916, it was raised to $25 a week. On April 1, 1916, it was fixed at $54.17 a half month. On November 1, 1916, it was increased to $108.33 per half month. On January 1, 1917, it was increased to $162.50 a half month. On September 1, 1919, it was reduced to $83.33 a half month. That was effective until April 1, 1921. He resigned on the 7th, I think of March, but our record shows

he was paid up to April 1; that would be customary with any employee leaving the company."

In 1918 Mr. Lane was elected president of the company in place of Mr. Parker, and the latter soon severed his connection with the company.

We quote some of the testimony of the secretary and treasurer:

"Mr. Parker's relationship at the time he retired was not friendly to our company. The securities commission had made several orders that affected him, and he was not re-elected president. His salary had been cut and very unfriendly relationship existed at that time, I am sorry to say, between Mr. Parker and the company."

When there was talk of reducing his salary Mr. Allen testified he protested against it. We quote:

"I had my pay reduced September 1, 1919. I had a talk with Mr. Lane in regard to that a little while before. I could not just say when it was—in the preceding month anyway. That would be in August, 1919. That conversation took place in his office. He told me that he was very sorry, but owing to the condition of the company they would have to cut my wages, and that they were also going to employ some other chemist to come in with me, and I told him that I was very disappointed; that I could not very well live on that, and explained to them that the high cost of living with a sudden dump down like that, that the thing hurt. He says: 'I don't want you to look at it as hurting you, because it is really not so. You can practically make your own time and do what you please, and be outside; in fact, you can look upon yourself almost as a free agent.' That, of course, toned the thing down. My pay had been $3,900 a year for the two years previous. On September 1, it was cut to $2,000."

The secretary and treasurer of the company testified in part as follows:

"When we reduced Mr. Allen's salary on September 1, 1919, we in a way put him on the pension list, kept

him there because of past services; it was something like that. That is not just an accurate statement of my attitude towards Professor Allen. The company's attitude was to take care of Mr. Allen. I will say it was not my idea at that time that anything would ever happen that would make the company raise Mr. Allen's pay, or anything happen to make them reduce his pay."

At or about this time another chemist was employed by the company.

In May, 1917, Mr. Allen took out a patent for a pickling process. We quote from his testimony:

"I filed that application May 10, 1917, but it had been in use for quite a time. It was very satisfactory. That process was used during the period I was with them. When I left them it was still in use by the plaintiff. When I got out this patent I told Mr. Parker that I was taking it out; that I would give him the shop rights. He had no objection to that. I explained to him that I was taking it out in my own name; it could not be anybody else's name, and that I would retain the title to it and give the plaintiff the shop right to the patent. * * *

"There was some kick that I should turn over everything. I said 'nothing doing.' Mr. Lane may have been or may not have been present. I could not say. I could not say who was in there. I said it was outside of actual business; it belonged to me. I told them I was taking out numbers of these things and I would not do any such thing — assign rights to them—assign the exclusive right in th·s patent. That discussion became a little warm, and I told them to take it or leave it, and they took it. That was April 18, 1919."

Mr. Lane was the president. This testimony was practically undisputed, though plaintiff says it acquiesced to avoid a dispute.

We quote further from Mr. Allen:

"They reduced my wages the following September. I filed this application with the patent office for the rusticide on September 25, 1919. I made experiments with this formula known as rusticide over in the

laboratory of the college of pharmacy in the Detroit Institute of Technology. I am a professor over in that institute. I have been a professor there since 1891, first of all as an assistant, then as professor, then as dean; then as dean emeritus, and I hold the professorship of chemistry. They have a laboratory over at the college. I cannot tell you the exact day I made the first test, but it was some time about the opening of school, probably about the 14th or 15th of September, 1919. I am quite sure that I did not make any tests on this rusticide at the plant of the plaintiff prior to the filing of the letters patent.

"As to what this process consists of and how I happened to test it out, I would say a man may have a thing in his subconscious mind for many years. I was over in the laboratory there. I had some rusty iron there, and it always had been a dream in my head to get something you could put on freight cars and other things like that, that were covered with rust. * * * And I shook them all up and I poured them on one of the pieces of rusty iron I had there cut up small something like that (indicating). I had in my cupboard over there some considerable quantities of pieces of rusty iron. I used to boil up things and try things accordingly as things came into my head. By 'over there' I mean the laboratory of the college of medicine. Then I went home—just left it. When I came back the next day it was perfect—beautifully black. I took my knife out and cut through it and everything else. I was perfectly well satisfied. I was so glad I called Stout over; he is the dean now; and I told him what I had."

Mr. Stout corroborated this testimony. This is the process in controversy in this litigation.

Mr. Allen further testified that he made up some of the preparation and tried it out at a garage owned by the plaintiff. We quote:

"There was a warped door on the garage. The garage was about as wide as this room, and there were three or four—there were three big doors about that size (indicating), and somebody had very nicely put on that garage door an angle iron to straighten out the warping, and it was beautifully rusted. You

know this was the Parker Rust-Proof Company people. To the Rust-Proof people I said: 'This is a damned nice ad.' I said, 'I am going to try this stuff on,' and proceeded to do it. Then I daubed it all over, most of it, with that formula. I think I put a little section with some glucose on there, and I drew the attention—well, there wasn't any need, someone said, 'Allen, what are you doing?' I said, 'I have got some good stuff here that I want protected, and I want to see what you fellows think of it.' They said it was all foolish or faulty. They could not see any good in it—none of them. * * * I talked to Mr. George Lane, the general manager and president at that time, and had some acid ordered from the Warner Chemical Company. * * * Those five carboys came on in the next shipment which was unloaded in the Parker Rust-Proof Company's place, their warehouse, and for which I paid, or rather, the firm paid. They were invoiced to me but by some error the firm paid on my invoice and I paid the firm. That is the material that I was using in rusticide. The officials of the plaintiff company knew at that time the use I was making of those five carboys of acid. It was no secret.

"In an effort to try and interest the plaintiff company in the production of this rusticide I talked with Lane, Bristol, Charles Awkerman and two or three of the other fellows around there. * * * He saw that bar of iron along with the other men as they passed it twice a day, but nobody thought it was any good. I asked him what he thought of it, and he found fault with it. You simply cannot go further with a thing when a fellow tells you it is no good. He was sufficiently interested in it to say it was no good."

The officers of the company admit their attention was called to the application on the garage door, as stated by Mr. Allen, but say they did not suppose the formula had been perfected so it was commercially valuable.

As to the stock claimed by the defendant, the bill of complaint has this averment:

"That this plaintiff, because of the breach by said

Allen of his agreement with this plaintiff and his refusal to assign to this plaintiff the patent heretofore issued as described in paragraphs ten and eleven, as required by the terms of said agreement, has kept in its possession said certificate of stock and refused to surrender same to said Allen until he has executed the assignment of said patent as required by his contract of employment and subsequent agreement of December 6, 1915, that upon the compliance by said defendant with the terms of his said agreements this plaintiff is ready and willing to surrender to him the certificate aforesaid."

The trial judge, after hearing all the testimony, expressed himself in part as follows:

"Allen was not hired to make inventions. He was originally hired to straighten out the process Parker was using, which was a hot process. The discovery of the rusticide process did not occur while Allen was at the plaintiff's plant or in the service of the plaintiff or of Parker. This was a 'cold' process as distinguished from the 'hot' process plaintiff and Parker always used. It occurred when and while he was at the Detroit college of pharmacy performing his duties there. He was connected with the college since 1891. The plaintiff's officers knew this. They knew he worked for others as well as plaintiff. They do not claim that plaintiff was entitled to Allen's entire time. In fact, they concede that he was to a certain extent his own boss. He came and went as he pleased. He was required to put in no set hours of service or any particular time of service each day. Therefore, even if it were conceded that the contract, Exhibit 2, was valid and binding on Allen, plaintiff would not be entitled to an assignment from the latter of the rusticide patent. But Allen claims that the latter contract is not valid and binding and I think there is quite a satisfactory basis for his claim. I am satisfied from the evidence that Allen executed this document without knowledge of its full contents and reasonably believing it to be merely a document designed to make more perfect plaintiff's title to the patents previously assigned by plaintiff to Parker and by the latter to plaintiff. It is, however, unnecessary

for me to here decide whether or not the contract could be avoided by him for this reason, as I am satisfied that it is not enforceable for other reasons. The plaintiff never issued to him the stock therein mentioned. He was in plaintiff's employ before and at the time he executed it. There was no change whatsoever in the terms or conditions of his employment. Plaintiff paid him nothing whatsoever in consideration of its execution. In short, no advantage whatsoever accrued to Allen and no detriment whatsoever was suffered by plaintiff in consequence of its execution. It was executed absolutely without consideration and it would be unconscionable to enforce it as against Allen. The evidence indicates that after its execution by Allen it was laid away and apparently forgotten for a long period of time. It was not preserved, cared for and remembered as valuable and valid contracts usually are. No demand was made that Allen assign any patents to plaintiff until a few weeks before he left plaintiff's employ although plaintiff's officers knew long before that time of the discovery by Allen of the rusticide process.

"The agreement between Parker and Allen evidenced by Exhibit 8 (if such agreement in fact existed) was a personal agreement between Parker and Allen. It was terminated when the plaintiff corporation took over the business and it was not assignable by Parker to the plaintiff. *Globe & Rutgers Fire Ins. Co.* v. *Jones*, 129 Mich. 664; 26 Cyc. p. 984. The mere fact that plaintiff paid Allen the same wages for a period after it took over the business is not sufficient to bind Allen to the terms of his personal contract with Parker in whom Parker had 'implicit' confidence. The bill must be dismissed.

"It is conceded that plaintiff holds certain stock belonging to Allen. It has no right to hold this stock. Allen is entitled to a decree for the delivery over of the stock."

The situation as developed by the testimony was practically as follows: A contract was made by defendant with Mr. C. W. Parker, who was to fix his salary from time to time "and I will decide in accordance to the success of the business to which your

efforts may have had to do." Mr. Parker had been relieved of the presidency, and left the company under such circumstances as to warrant the inference that he had been crowded out. Mr. Allen had his salary reduced and the circumstances indicate he had been put on the retired list. Another chemist had been employed. He had invented a cold process after this had happened, and while at work at the pharmacy where he had been connected so long. He called the attention of the officers of the plaintiff company to his process, and they did not regard it favorably, and it was not until after he had interested somebody in the process that they indicated a desire to possess it for the plaintiff company.

It may be well to refer to the paper of December 6, 1915. We have already stated the claim of Mr. Allen as to the circumstances of its making. There was no agreement made at that time by the company to increase Mr. Allen's salary or to continue it even for a day. There was no agreement to advance any fees to pay the expenses of getting the patent. There was no agreement to manufacture the product patented. There, in fact, was no change in the status of the parties because of the signing of this paper. At the time the instant suit was brought, and for a long time before, Mr. Allen was entitled to the delivery of stock of the par value of $10,000, but it was withheld from him.

Under the facts disclosed by this record we are not inclined to disturb the decree made by the chancellor. See *Dalzell* v. *Dueber Watch Case Manfg. Co.*, 149 U. S. 315 (13 Sup. Ct. 886) ; *Detroit Testing Laboratory* v. *Robison*, 221 Mich. 442, and cases cited therein.

The decree should be affirmed, with costs to the appellee.

BIRD, J., concurred with MOORE, J.

FELLOWS, J.   This bill was filed to secure the assignment to plaintiff of four letters patent held by defendant.   They are as follows:   No. 1,290,476 for which application was filed January 8, 1917, and issued January 7, 1919; No. 1,321,182 for which application was filed May 10, 1917, and issued November 11, 1919; No. 1,341,100 for which application was filed November 18, 1918, and issued May 25, 1920; and No. 1,329,573 for which application was filed September 25, 1919, and issued February 3, 1920.   The first three of the patents named are improvements on and aids to plaintiff's process of rust-proofing.   They pertain to its process and are styled by defendant in his testimony as "protective" patents.   He also testifies that he was employed to protect the Parker business. There can be no doubt upon this record that these patents are protective of the Parker business; they were all applied for when defendant was in the employ of plaintiff for the purpose stated and was receiving a salary of $3,900 a year from plaintiff which, as disclosed by this record, was greater than he ever before received in his life.   The other patent is the so-called "Rusticide patent."   It covers the application of a rust-proofing compound while cold.   It was applied for after defendant's salary had been reduced to $2,000 but while he was still in plaintiff's employ. While it was actually discovered at the laboratory of the college of pharmacy, he had been experimenting with it for a long time at the Parker plant.   I do not understand the rule to be that one employed as an inventor and paid a salary as such may, because the successful idea comes to him when away from the plant, appropriate to himself the invention or sell it to the competitor of his employer.   But I think this record fairly discloses that defendant called attention of the officers of plaintiff to the rusticide process and was willing to turn it over to the company but that they either through failure to give it proper attention

or otherwise took no interest in it and gave defendant to understand they did not want it and that thereafter he entered into engagements with others so as to estop plaintiff from now insisting on the assignment to it of this patent.    For this reason, I agree with Justice MOORE that defendant should retain the rusticide patent.

As to the other three patents, those which are protective of the plaintiff's business, and which pertain solely to its process, which defendant was employed to perfect and protect, I discover no good reason for withholding them from plaintiff and giving them to defendant thereby permitting him to harass plaintiff or sell them to its competitors.    And upon this branch of the case, I think it is unimportant whether defendant knowingly executed the contract of December 6, 1915, or was employed as he testifies to protect the Parker business.    If he knowingly signed the contract of December 6, 1915, he is bound by its terms to assign these patents to plaintiff.    If he was employed as he swears he was to protect the Parker business, and to perfect and improve plaintiff's process by patents which he himself styles "protective" patents and has been paid therefor, as he has been, then plaintiff is entitled to these patents.

I take but little stock in defendant's claim that he did not know what he was signing when he signed and acknowledged before a notary public the contract of December 6, 1915.    He claims it was brought to him by Mr. Parker and that he took it to a notary public and acknowledged it before him.    While in some of his testimony he claims he does not remember any of the conversation between him and Parker, in another part he claims that he supposed it was to "cover an assignment of a couple of patents."    The notary public before whom it was acknowledged, while not recollecting the circumstances, testifies from his universal custom that he either read the paper

over to defendant or ascertained that he knew its contents. While placing some credence in this claim of defendant, the trial judge also found that the $5,000 of stock provided for in the contract had never been issued to the defendant. In this the trial judge was clearly in error. He was doubtless confused on the subject. The undisputed evidence showed that a certificate for $5,000 of stock was issued to defendant. Later the capitalization of the company was reduced one-half and he surrendered his certificate and a new one was issued for $2,500; and the certificate for this stock and some other defendant had purchased was produced by him in open court and is an exhibit in the case. In addition to this $5,000 of stock, there was also issued to defendant $20,000 more of stock of the company, called bonus stock. This is possibly what led to the confusion in the mind of the trial judge. Under an order of the securities commission this stock was deposited in escrow. When the capital of the company was reduced, the certificate was surrendered and a new one for $10,000 was issued to defendant and this was likewise deposited in escrow. When it was released from escrow it was sent to the plaintiff, and its officers are and at all times have been willing to deliver this stock to defendant when he executes an assignment of the patents which belong to plaintiff and which now stand in his name. It seems strange that the company would issue and the defendant receive the $5,000 of stock provided for in this contract without some knowledge of the contents of the contract on defendant's part.

But if defendant did execute and acknowledge before a notary public this contract without knowledge of its contents and he was employed as he claims he was and as I have pointed out to protect the Parker business, and while so employed obtained in his own name these three patents which he admits are protective of the Parker business, there is no sound

reason for withholding from plaintiff these patents which they have already paid for and which he took in his own name but under the terms of his employment for plaintiff's use and benefit. Before difficulties arose he had assigned to plaintiff other similar patents which were taken out in his name and by so doing recognized his understanding of his contract with and his duty to the company which employed and paid him. Upon the facts in this case I perceive no equity in a decree which gives defendant the rusticide patent, the $10,000 bonus stock and at the same time withholds from plaintiff the three patents which, as matter of law and matter of equity, it is entitled to.

I think a decree should be entered in this court requiring defendant to assign these three patents to plaintiff, confirming defendant's title to the rusticide patent, and requiring plaintiff to deliver to defendant the $10,000 of bonus stock.

MCDONALD, C. J., and CLARK, SHARPE, STEERE, and WIEST, JJ., concurred with FELLOWS, J.