GAS TOOL PATENTS CORPORATION
v. MOULD.

No. 8011.

Circuit Court of Appeals, Seventh Circuit.

Feb. 3, 1943.

Rehearing Denied March 27, 1943.

Edwin H. Cassels, Leslie H. Vogel, and George C. Bunge, all of Chicago, Ill., for appellant.

Harvey C. Hartwig, of Milwaukee, Wis., for appellee.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This is an appeal from a judgment in favor of the defendant in an action for

specific performance of a contract pertaining to inventions and patents relating to gas hammers. By its action, appellant sought disclosure of all inventions and improvements made by appellee in the field; the transfer and assignment of all such inventions and patents to appellant; an injunction to prevent further violation of the contract relied upon; and an accounting of all damages and profits resulting from the acts complained of.

The contract sued upon was executed in 1927, following a series of transactions by which appellee, J. W. Graf, and C. B. Duffey had obtained an exclusive license to manufacture and sell devices made under two patents pertaining to a gas hammer and an air-cooled cylinder, which had been issued in 1917 and 1923, respectively, to one Saunders. Under the terms of a contract executed in 1926, appellee and Graf had agreed to pay Saunders and one Hendricks, joint owner of the patents, $10,000 for title to the patents, acquiring upon payment of $500, the exclusive license to manufacture and sell the devices as long as they continued to manufacture them or until they became the owners of the patents. This $500 was the only amount in fact paid under this agreement. In 1927, appellant was organized as a holding company for the patents, and appellee, Graf and one Duffey, who had paid $3,000 for a 10% interest in the patents, executed the contract sued upon as follows: "In consideration of the issuance to the undersigned of one thousand shares of the capital stock of Gas Tool Patents Corporation, a Delaware corporation, receipt whereof is hereby acknowledged, the undersigned J. W. Graf, J. A. Mould and C. B. Duffey hereby assign, transfer and set over unto said Gas Tool Patents Corporation, its successors and assigns, all the rights of the parties of the second part under that certain contract entered into July 23, 1926, by and between Samuel R. Saunders and Joseph Hendricks as parties of the first part, and J. W. Graf and J. A. Mould as parties of the second part, including all the right, title and interest of the undersigned in and licenses under certain letters patent of the United States, No. 1237827 for a gas hammer, and No. 1463595 for a cooling system for air-cooled motors, also Canadian letters patent No. 228089, and Mexican letters patent No. 21116, on a cooling system for air-cooled motors, as set forth in said contract of July 23, 1926, it being the intention hereof to substitute said * * * (appellant) as party of the second part in said contract as fully as though it had been named as second party therein when originally executed; and *upon the same consideration the undersigned further assign * * * unto said Gas Tool Patents Corporation any and all inventions in which they or any of them may have an interest, whether patented or unpatented, relating to the subject-matter of any of said patents or improvements thereon, including any invention or improvement that they or any of them may make in the future relating thereto, and hereby agree that they will upon request from time to time in the future execute such further assignments and conveyances as may be necessary to vest the entire title to any such inventions and the patents therefor in the said Gas Tool Patents Corporation * * *"* (Our italics.)

Appellee was elected president of the holding company. He was also president of the Milwaukee Gas Tool Corporation, organized at the same time, for the purpose of manufacturing under the license agreement. He was a mechanical engineer and had worked on various types of internal combustion engines since 1908, obtaining patents on two devices invented by him. He was employed as engineer of the Milwaukee Corporation from July 1927, until its adjudication in bankruptcy in September 1928. During this period a new model of gas hammer had been developed by it. Following the bankruptcy of the manufacturing corporation, a new one, the Rodax Manufacturing Company, had been organized with appellee as its president and engineer, and holder of 51% of its stock. It was agreed that Rodax would continue the development of the gas hammer, paying all costs, and applying royalties due appellant on such costs. In 1930, Rodax refused to furnish any additional funds for development, and appellee then sold his Rodax stock to one Jones of that company which thereupon discharged appellee as engineer. A series of patent applications, covering all improvements worked on by appellee up to the time of his discharge were duly assigned by him to appellant and the patents were duly issued thereon to that corporation.

After appellee left the employ of Rodax he remained unemployed for four years. He continued to hold the office of president of appellant until January, 1935, although his only activity as such was to preside at the annual meeting, and he did

not even know of his re-election in January 1935, for the reason that it was brought about in his absence by proxy voted by a third party. He continued to drop into the Rodax plant frequently, and discussed with Jones and one Frantz, an officer of appellant, an idea he had for utilizing a patent for a pressure riveter involving an internal combustion engine operated by an external spring. Both assured him they could do nothing about developing it.

In 1934, in order to enable Jones to sell his stock in Rodax to one Bard, who also wanted the stock in appellant, he sold the latter stock to Jones for $3,000, and Jones agreed to obtain a release from any obligation he might still have to appellant. Although Jones was the majority stockholder in appellant after this transfer, until the sale to Bard, the release was never delivered to appellee.

Appellee, otherwise unemployed, worked on his device from June 1931 to 1935. In July 1935, he called on Boddinghouse, an employee of the Barco Company, of which Bard was sole owner, and showed him the drawing of his device, then described as a new hammer. Boddinghouse took the matter up with Bard who wrote to appellee, in July 1935, that they were not much impressed with Boddinghouse's outline, but that if appellee wanted to come to Chicago (from Milwaukee) he would have their engineers go over it with him. Appellee replied that he could not come to Chicago, but that he had explained fully to Boddinghouse. Hearing nothing further from Bard, two months later he started work on the final development of his hammer, as illustrated by a drawing completed in January 1936, and a model constructed thereafter. Late in 1936, Boddinghouse, acting under instructions from Bard, called on appellee in Milwaukee and asked to see the hammer, suggesting during their lengthy conversation that he thought Bard would be willing to pay for it.

May 19, 1937, by letter signed in the name of appellant by Bard, demand was made for the immediate assignment of all inventions pertaining to gas hammers and all improvements, patent applications and patents concerning the same, and also that appellee cease the manufacture and sale and the offering for sale of gas hammers embodying any of the inventions covered by the agreement of February 1927. In October 1937, appellee sent his final drawing and his patent application to appellant's attorney, and they were not returned until February 1938. In January 1938, Bard wrote that the features embodied in the hammer seemed to have been anticipated to such an extent by the prior art as to militate against the possibility of appellee's putting it on the market, but that the machine did have some nuisance value to appellant, hence they offered $2,500 for the complete assignment of all rights in it. The patent, No. 2,219,816 (issued in October 1940, on application filed in October 1937), the assignment of which appellant here demands, is for an improvement in motors, irrespective of their purposes or motive power. The District Court described the device as follows: "In this new design the piston was returned by four torsion springs, placed outside of the cylinder, which were fixed to a rotor having an arm extended through the wall of the cylinder engaging a slot in the piston. It also contained a method of starting and stopping the engine by indirect means, and a timer which worked off the rotor. The specifications describe the invention as relating to 'the improvement of motors.' The patent discloses that the invention is applicable to motors for any purpose and operating mechanically, pneumatically, hydraulically, electrically, or by steam or internal combustion."

In rendering judgment for appellee, the District Court called attention to the fact that the agreement with Saunders was a license agreement and not an assignment of patents, and that the right to manufacture, use and sell the gas hammer and cooling device involved was limited in time "as long as the said parties of the second part shall continue to manufacture said gas hammer and cooling device or until they have become the owners thereof."[1] The court also called attention to the fact that the Saunders patents were not basic patents, but that they were limited in scope, and that, "Undoubtedly when the parties executed the contract of February 5, 1927,

---

[1] This contract contemplated further payments out of profits up to a total of $10,000, and upon execution of the contract sued upon, appellant became obligated to continue the payments agreed upon by appellee and the two other signatories. However, upon inquiry by Mrs. Saunders early in 1938, she was informed by Bard that appellant had nothing to do with the contract and he suggested that she get in touch with appellee and Graf.

they had in mind the particular function accomplished by the Saunders patents, rather than the broad field of the possible future development of any kind of gas hammer." He further stated that even appellant's expert testified that none of the claims of the Mould patent here demanded were based upon any of the combinations in the Saunders patents. In view of these limitations, he considered that a construction of the contract requiring appellee to turn over any invention he might make at any time in the future which could in any way be used in connection with any kind of a gas hammer was not required, and that the invention worked out by appellee from 1931 to 1937 was not in contemplation of the parties to the contract. He therefore exercised the discretion lodged in a court of equity to refuse to decree specific performance. In this we think there was no error.

■ We start with the premise that patentable discoveries are the legitimate subject of contracts to assign, and that, with certain limitations, action for specific performance lies for failure to execute the assignment required by the contract. See Guth v. Minnesota Mining & Mfg. Co., 7 Cir., 72 F.2d 385, and cases there referred to. While the contract here involved is not the ordinary employer-employee one, the same general principles of construction must be applied. Such contracts, when they provide for the assignment of patents beyond the term of the employment, are to be strictly construed; they must be fair, reasonable and just. The rule is further stated in 25 R.C.L. Specific Performance § 108, "Nor will equity compel compliance with an agreement to assign future inventions made after the inventor, having been discharged from the employment of the other contracting party, has assumed, with such party's acquiescence, that the contract is terminated, and has expended time, efforts, and money in developing and exploiting new ideas." (Citing Reece Folding Machine Co. v. Fenwick, 140 F. 287, and 2 L.R.A.,N.S., 1094 and note.) [2]

■ The contract here involved did not require appellee to continue working to develop the implements in which appellant was interested, and indeed, after his discharge by Rodax in 1931, there was absolutely no incentive for him to do so. It cannot be said here that he learned the art from appellant, hence was duty-bound not to develop anything in competition with it, for, before his relationship with it, he was an experienced mechanical engineer who had already obtained patents on two devices invented by himself. His experience was related to the problems involved in internal combustion engines, and this, of course, carried over into his work on the narrower field of gas hammers. This, however, was not a new field, and, as pointed out by the District Court, the Saunders patents were not basic ones. Hence it is significant that, although appellee's new invention, which appellant wants, could be used on gas hammers, it does not make use of any of the elements of the Saunders combination patents, and its use is by no means limited to that field, but instead, is applicable to any motors used for any purpose and utilizing any motive power. Apart from the other reasons suggested for denying appellant the relief here sought, we are convinced that the patent was not so closely related to the narrow field limited by the 1927 contract as to require assignment. Mullins Mfg. Co. v. Booth, 6 Cir., 125 F.2d 660.

Judgment affirmed.

---

[2] See also Parker Rust-Proof Co. v. Allen, 231 Mich. 69, 203 N.W. 890, where the court refused to require assignment of a patent developed by an employee during the term of his employment, but away from the premises, where the record disclosed that "defendant called attention of the officers of plaintiff to the rusticide process, and was willing to turn it over to the company, but that they, either through failure to give it proper attention or otherwise, took no interest in it, and gave defendant to understand they did not want it, and that thereafter he entered into engagements with others so as to estop plaintiff from now insisting on the assignment to it of this patent."