Argued January 10, reversed and remanded January 30,
petition for rehearing denied February 19, 1963

ROBINSON ET UX *v.* MANNING ET AL
378 P. 2d 277

*Ronald K. Ragen,* Portland, argued the cause for appellants. With him on the brief were Black, Kendall, Tremaine, Boothe & Higgins and Ferris F. Boothe, Portland.

*Clarence A. Potts,* Portland, argued the cause for respondents. On the brief were Potts & Davidson and Harold L. Davidson, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, SLOAN, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendants, Olive Robinson Manning, Tom Manning, Everett T. Robinson, and Ann Robinson, from a decree which the circuit court entered in favor of the plaintiffs Thomas Arthur Robinson and Lura M. Robinson, husband and wife. Thomas Arthur Robinson is the father of the defendants-appellants Olive Robinson Manning and Everett T. Robinson. The defendant-appellant Tom Manning is the husband of Olive Robinson Manning, and the defendant-appellant Ann Robinson is the wife of Everett T. Robinson. The plaintiff Lura M. Robinson is the second wife of the other plaintiff, Thomas Arthur Robinson, to whom we may hereafter refer as the father. The latter's first wife, who was the mother of Olive and Everett, died January 15, 1958. August 28, 1958, the father married Lura. During the lifetime of his first wife the latter and he became the owners of two lots in Portland which the complaint describes as having a market value of $35,000. That, apparently, approximates its

value. The lots are improved with some old structures to which the witnesses referred as apartments. The property yields an income. The father testified that about a year after his second marriage he became suspicious that Lura had designs upon his property, and shortly, without her knowledge, executed two deeds which he dated back to a time prior to the marriage. They conveyed one of the lots to his daughter and the other to his son. The purpose of this suit is to cancel those deeds. When the father became suspicious of Lura he visited his daughter, Olive, in Olympia, Washington, and told her of his misgivings. Upon the trip he was accompanied by Lura, but she went to the home of her son while he stayed in Olive's home. After the father had told Olive of his mistrust of Lura he expressed his purpose to convey one of the lots to Olive and the other to Everett. He asked Olive to obtain an attorney who could prepare the deeds. According to him, he wished a provision included in the deeds "so if things were right, I could sell at any time I wanted to, that they would deed back to me." He swore that Olive approved. Presently an attorney in Olympia was obtained and the father consulted with him. When the father insisted that the deeds should be dated back to a time prior to the marriage of the father to Lura, the attorney demurred and suggested that the father consult a Portland attorney; he recommended one by name. Lura knew nothing of the above. Shortly the two returned to Portland. After the father and Lura reached Portland the father had the Portland attorney whose name had been given to him by the Olympia practitioner prepare the two deeds which are now under attack. The father swore that Olive was the one who spoke to the attorney. One of the deeds conveys one of the two lots to Olive, and the other conveys the

other lot to Everett. Each says, "reserving unto himself the right to collect all rentals from said land, if any there be, for so long as he shall live." Each deed expresses as consideration $10.00 and other good and valuable consideration to him paid by  *   *   *." No money was actually paid.

After the Portland attorney had prepared the deeds they were delivered directly to the father. The latter was then in the home which he maintained upon one of the two lots which we have mentioned. According to the father, he handed the deeds to Olive and the two went to the basement of the house to attend to the execution. He stated that he resorted to the basement so that Lura, who was in the dining room, would not know of the deeds. Although the father was capable of reading, he had Olive read the deeds to him; and at the conclusion of her act in so doing he asked her, so he swore, "Is it in there that I can sell the place any time I want to?" and received the reply, "Oh, yes, Dad." The father then signed the deeds. Although the signing occurred in the latter part of August 1959, the deeds were dated back to February 24, 1958, which was prior to the time he married Lura.

No notary public was present when the father signed the deeds and the father did not acknowledge his signature to the notary public whose certificate and seal appear upon the instruments. The new wife knew nothing of the deeds to the son and the daughter until many days after their execution.

The complaint prays among other demands for relief that both deeds be canceled and that the father be decreed to be the owner of both lots.

The son and the daughter do not concede that they made any false statements to their father. Olive testified that her mother, who was the father's first wife,

was "the business manager" of the family and that it was she who prompted the investment in these two lots. She also testified that following the mother's death the father told her (Olive) that in accordance with an understanding that he had with the mother he intended to give to Olive a deed to one of the lots and to Everett a deed to the other. Everett testified:

"Q Were you here in Portland at the time, or immediately after your mother's death in 1958?
"A Yes.

"Q Did you discuss with your father, or hear your father discuss what he planned to do with his property after the death of your mother?
"A Right at the time Dad was wanting to give us everything and I told him to just take his time and he wanted to get documents drawn up and split everything right down the middle for Sis and I."

According to Everett, neither his father nor he ever mentioned again the two lots, and he knew nothing about the deeds until in August of 1959.

The father stated, so Olive swore, that he wished to retain for himself the income of the property during his lifetime. As a witness the father conceded that he had mentioned to Olive a purpose to convey to the son and the daughter the lots, but denied that he did so immediately following the burial service for his first wife. He said he mentioned the subject "around April 1959, April or May." He testified:

"Q Well, you did discuss with your daughter what was going to be put in their joint names?
"A I was just going to deed the property over to my daughter and son—I and Olive and I and Everett so I could sell at any time I seen fit to sell it.

"Q Did you talk to them right after your wife's death in 1958?

"A No. No.

"Q When was the first time?
"A In 1959.

"Q When in 1959?
"A Around April in 1959, April or May.

"Q In connection with that, you went up to Olympia, did you not?
"A Correct.

"Q And you were with your wife, but you stayed at different places?
"A My wife stopped down to her son's at Tenino.

"Q Where did you stay?
"A I went up to my daughter's.

"Q Did you ask your daughter to find some attorney to take care of these deeds?
"A I did, sir."

The words in the quoted question, "to take care of these deeds," meant the drafting of the deeds.

It will be noticed from the foregoing that the son and the daughter contended that the father wished to convey the property to them and that he announced his intention immediately after the death of his first wife, that is, before his second marriage. Upon the other hand, he insisted that the announcement was made in April or May of 1959, several months after the new marriage.

From the foregoing it will be seen that the father who at that time was disappointed with his new wife, wished to deprive her of any interest in his real property. He owned no other real property than these two lots. In fact, the only other items of property that he

owned were an automobile and a trailer; he had paid $2,000 for the trailer. He testified that he had one dollar in a bank. Before his marriage to Lura he had told his prospective bride of his ownership of this real property and of the trailer. Thus, if the wife is deprived of her inchoate dower interest in the real property she will have nothing. In order to bar his new wife of any possible interest in the property he not only signed the deeds but also had them dated back to a time prior to the marriage. Later he seemingly revised his estimation of his new wife and at that time had this suit instituted. Or it may be that the property has enhanced in value and that he wishes this suit to place him in a position to sell it. His son and his daughter seem to believe that he wishes to sell the property, and they have told him that they will retain it for him so that he will have a roof over his head and the income that the property produces.

We quote the following from *Casteel v. King*, 201 Or 234, 269 P2d 529:

"It is well settled that the assumption of equitable jurisdiction in a given case is dependent upon an exercise of discretion in accordance with the dictates of judicial conscience. In the exercise of this discretion, courts are guided by well known maxims of equity, a cardinal one of which is that one who comes into equity must come with clean hands. Referring to such maxim, we quoted from 2 Pomeroy's Equity Jurisprudence, 5 ed, § 397, pp 91-92, in Dickerson v. Murfield, 173 Or 662, 670, 147 P2d 194, as follows:

" ' "* * * It says that whenever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*; the court will refuse

to interfere on his behalf, to acknowledge has [sic] right, or to award him any remedy." ' "

■ In the case at bar the father did not execute the deeds until Lura had become his wife and had an inchoate dower interest in the two lots. We believe that he wished his son and his daughter to have the lots upon his death. He had an even greater propelling motive that Lura should have no interest in the lots, not even her inchoate dower interest. Under those circumstances he signed the deeds. He concealed his iniquitous purposes as to Lura from her and she knew nothing about the deeds until two or three weeks had passed after their execution. If the father's fraudulent action is sustained, the new wife will fare no better than if she had married a destitute even though he showed her this property before she became his betrothed. We think that the foregoing maxim which governed *Casteel v. King,* supra, likewise governs this case. The father is not entitled to the aid of a chancellor in helping him to escape from the predicament into which his own iniquitous conduct cast him. A decree will be entered for the defendants. It will not prejudice the rights and inchoate dower of the new wife, Lura.

Reversed and remanded. Neither costs nor disbursements will be allowed to any party.