Argued June 6, reversed September 21, petition for
rehearing denied November 8, 1972

MARTIN ET AL, *Respondents, v.* TIKKA ET AL,
*Appellants.*
500 P2d 1209

*Thomas A. Sherwood,* Portland, argued the cause for appellants.

*Morton A. Winkel,* Portland, argued the cause for respondents.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL, and BRYSON, Justices.

BRYSON, J.

Plaintiffs brought this suit for specific performance of a contract whereby defendants were to purchase a fertilizer plant. Defendants affirmatively allege that they were induced to enter into the agreement to purchase by plaintiffs' fraudulent misrepresentations.

Plaintiffs Martin are husband and wife and owners of all of the shares of plaintiff Portland Organic, Inc., an Oregon corporation. Portland Organic, located in north Portland on land leased from the city of Portland, manufactured fertilizer from sewage sludge from the cities of Portland and Lake Oswego. The sludge was stored, or accumulated, in a lagoon adjacent to plaintiffs' plant and adjoining the city of Portland's sewage disposal plant.

Negotiations between the parties began in August, 1969, and on September 2, 1969, they entered into a contract whereby plaintiffs would sell and defendants Tikka brothers would buy the fertilizer business, assets, and buildings situated at 5303 North Columbia

Blvd., Portland, Oregon, on land leased from the city of Portland, for the sum of $30,000. Payment was to be accomplished by defendants conveying to plaintiffs their equity in "Haven Apts" and an adjoining lot (lots 1 and 2, Block D, Slocums Addition to Vancouver, Vancouver, Washington), and the payment of $5,000 (later $4,500) in cash. The exchange contract provided:

> "This deal contingent upon the buyers being able to secure from the City Of Portland, the minimum of a five year lease with the same terms and conditions as previously provided to Portland Organic Inc., buyers shall have the option of buying the stock of Portland, Organic Inc., or it's [sic] assets as described."

Prior to the exchange agreement, plaintiffs and their agent, Joe DiGregorio, of Allied Realty Co., made a number of material representations to the defendants concerning the transaction. The defendants were told that Portland Organic, Inc., marketed its products under the labels of Gro-King and Portorganite; that Gro-King sold for $120 per ton and Portorganite sold for $70 per ton; that in eight months of operation plaintiffs had sales of $12,000; that the plant production capacity was ten to twelve tons per eight-hour shift; that the kiln had a capacity of sixteen tons; that the depth of the sludge, used in manufacturing the fertilizer, was four to eight feet in the adjoining lagoon; that this sludge could be scooped out by a front end loader; that the plaintiffs had a lease for the land and facilities from the city of Portland, Oregon, which provided for a $50 per month rental, and that the city provided methane gas for the kiln (a by-product of the city sewage plant) free of charge; that the lease granted permission to the lessee to maintain the exist-

ing roadway over the city's property for the purpose of ingress and egress; and that the lease permitted plaintiffs to utilize a spur rail track adjacent to the leased premises.

It was agreed that the exchange of properties would take place on November 1, 1969. By this time defendants knew that plaintiffs' lease from the city of Portland had expired, but they were led to believe that the lease would be renewed or a new lease secured and assigned to defendants, with the same terms and conditions.

David Tikka testified that they went into the plant on November 1, 1969, and made some improvements within the plant structure, improved the access road to the premises, and hired a salesman who was to begin December 1, 1969. Sometime after January 1, 1970, the defendants received their first purchase orders for 188 bags and 117 bags of fertilizer, for a total of 12,120 pounds. At this time they began active production and operation of the plant. After a net of eight hours of operating the kiln, they discovered they did not have enough finished product to fill a six-ton order. The plaintiffs had represented that the plant had a production of ten to twelve tons per eight-hour shift. Portland Organic's federal tax returns for the years 1967 and 1968 were received in evidence and showed gross annual sales of $6,874.20 and $8,646.71, respectively. There is no evidence of gross sales of $12,000.

When defendants' salesmen attempted to sell the plant's fertilizer products, they discovered that the plaintiffs had sold Portorganite for $25 per ton, not $70 as represented, and that Gro-King sold for $75 per ton, not $120 as represented.

The plaintiffs had represented that the sludge material in the lagoon was four to eight feet in depth, and the defendants had made their sales and sludge supply projections on the basis of this figure. About January 16, 1970, David Tikka was trying to remove sludge from the lagoon and experienced difficulty. He tried several different kinds of front end loaders with rubber-tired wheels and a nine-track vehicle but could remove no further sludge. Finally, defendants employed Stanley McKay, an experienced excavating contractor and equipment operator, to locate sludge material within the lagoon in order to process fertilizer. Mr. McKay testified he used "[a] three-quarter-yard dragline with fifty-foot boom. * * * [A] crane with a dragline bucket attached by a hoist line, which suspends it, lifts it up and down, and another line that pulls it toward the machine." He testified that he could not remove the sludge and, further, that there was not sufficient depth of sludge to allow removal of the same from the lagoon. He further testified:

> "Well, I had discussed the problem with the Tikkas about the problem we had in not getting the sludge out and the depth not being there so we called Mr. Martin, I believe, and he came out and he said, 'Well, it is four to eight foot deep out there,' referring to the north end of the lagoon, 'and then some over on the west end of the lagoon.'"

This was about the first of February, 1970. Mr. McKay operated a dragline and bucket all around the lagoon but could find no appreciable depth of sludge that could be removed for processing. By March, 1970, the city of Portland had begun rebuilding their sewage disposal plant and employed a Mr. Richard Blickle as the contractor to drain and remove the sludge from the small lagoon adjacent to the fertilizer

plant, as well as from the larger lagoon by the sewage plant. He testified that the sludge material in the small lagoon was "anything from nothing, you might say, at the edges, where it feathered out, to, in the deepest part, the tractors worked up to the top of the tracks * * *. [I]t is forty-four inches." However, Mr. Ronald Sluder, foreman and equipment operator for Mr. Blickle, testified regarding the work in connection with the new Portland sewage disposal site. He testified:

> "Well, I was first involved with building a new disposal site and, secondly, I was involved in dredging the sludge from the existing lagoon to the new lagoon.
>
> "* * * * *.
>
> "Q. Can you tell me with respect to the materials that you were trying to push out [of the small lagoon], how deep was it in, say, the deepest place?
>
> "A. The deepest place? We went from nothing to two-and-a-half feet."

Mr. Burl Bean, Chief Inspector, City of Portland Bureau of Sanitary Engineering, had a field office at the sewage treatment plant and oversaw the activity of Blickle Company. He testified:

> "I knew, when I saw the dozers working, I could tell how deep it was [the sludge material].
>
> "Q. And what did you observe when you saw the dozers working?
>
> "A. Well, as the dozers were pushing this material, it was all, oh, a foot or so deep, about even with the drawbar on the Cat as they were pushing it out."

Mr. Donald Tikka testified:

> "* * * [A]s soon as Mr. McKay notified us

this Saturday morning [February 7, 1970], we immediately determined that, with no sludge, the venture is an impossibility. We vacated the plant immediately on this news. * * * [W]e accomplished the whole thing by Sunday afternoon. We were completely out of the plant, being very careful that we removed no property belonging to Portland Organic. * * * As soon as we got our gear out of the plant, we secured the plant. * * * That evening, the four of us went to Mr. Martin's house, gave him the letter [of contract rescission], returned the keys * * *."

Originally, the plaintiffs represented that they had a valid lease from the city of Portland. Plaintiffs' attorney testified:

"Well, noticing the earnest-money receipt, I first realized that the first thing we had to do was to get a lease on the City property because at that time I knew that the lease which had been in existence had expired and I realized that, obviously, no buyer was going to buy this plant unless he had a lease with the City.

"Consequently, my first duty was to negotiate a lease with the City for the continued operation of the plant."

This explains the provision in the exchange contract which provides, "this deal contingent upon the buyers being able to secure from the City Of Portland, the minimum of a five year lease with the same terms and conditions as previously provided to Portland Organic Inc. * * *." A series of meetings and negotiations were carried on by plaintiffs' attorney to secure the renewal of the original lease, but these negotiations were unsuccessful. Finally, the City Council set a hearing for December 24, 1969, to repeal all lease arrangements on the property. Plaintiffs' attorney was out of the city and defendants appeared personally at the

hearing. The matter of repeal of the ordinance was postponed for two weeks, as revealed by the minutes of the City Council for that meeting, which are in evidence, and a meeting was arranged for January 5, 1970, between defendants, the city engineer's office, and Mr. Hurtig, Deputy City Attorney. The defendants then learned that the city was to build a new lagoon for a storage site and that no new sludge would be available at the lagoon by the fertilizer plant for a period of two years. However, based on plaintiffs' representations that the lagoon next to the fertilizer plant had sludge in it at a depth of four feet to eight feet, they estimated they could operate the plant with that source of sludge for the two-year period. Mr. Hurtig, Deputy City Attorney, testified:

"Q. What was the Tikkas' attitude toward the consummation of the lease?

"A. Their attitude?

"Q. Were they reluctant or enthusiastic or somewhere in between?

"A. Well, they had some reservations concerning the terms of this but they were only to specific items in there, as I remember. There was something about an access road and the location. There was a question of whether or not the material that they were to use could be preempted by the City for their use and the availability of the supply to other people.

"* * * * * *.

"A. There were some substantial changes, I would say, yes.

"Q. Such as the lessees would be required to post a penal bond in the amount of ten thousand dollars?

"A. I think that was one provision, yes.

"Q. And that the area of the leased or devised premises would be substantially reduced?

"A. That's right.

"Q. And that there would be an easement or a roadway, that the City would have basically carte blanche right to access across the premises by way of a roadway?

"A. I don't remember it exactly that way. I remember there was a discussion about that. I assume—I remember one thing was the location of the access roadway and who was going to pay for it because one particular way was considerably more expensive than the other.

"Q. Generally, then, there were some rather substantial changes between that—

"A. I would say so, yes * * *."

Thus, the defendants had some reservations concerning the terms of the new lease. This lease required the relinquishing of a portion of the original property, including a railway siding; payment of $3,000 toward a roadway across the property; and the posting of a penal bond in the amount of $10,000. The rental was to be $100 per month for the first year and $200 per month thereafter, not $50 per month. This lease was received by plaintiffs on the fifth or sixth of February, 1970. It was not offered or received in evidence.

On February 7, 1970, defendants found for the first time that the depth of the sludge in the lagoon was from nothing to approximately two and one-half feet, not four to eight feet as represented. They immediately gave notice of avoidance.

The trial court found that "* * * defendant brothers took possession of the physical assets of Portland Organic, Incorporated * * * although no lease

had been obtained from the City of Portland at that time"; that "[n]egotiations for such a lease had been carried on and were continued with the active participation of the Tikka brothers and Martin's [l]awyer until on or about the 8th day of February, 1970, when Tikkas attempted to rescind unilaterally, * * *"; that "[t]he brothers each testified to representations made by Martin which were claimed to be fraudulent but, * * * the brothers knew the truth of every matter claimed to be fraudulent but they continued in possession of the assets of Portland Organic, Incorporated * * *"; that defendants failed to establish the allegations of their amended answer. The court decreed specific performance of the exchange agreement of September 2, 1969, and dismissed the counterclaim of defendants.

Defendants contend that the court erred in granting specific performance and that "plaintiffs did not come into a court of equity with clean hands." We do not believe the evidence supports the court's findings.

The defendants allege that plaintiffs' representations were material, false, and known to be false by plaintiffs. We have said:

"* * * It is wrong to lie, and a person who has thus set a trap for the other party cannot be heard to complain that the latter should not have walked into the snare. It better comports with common honesty to condemn falsehood as a means of constructing a contract * * *." *Caples v. Morgan,* 81 Or 692, 702, 160 P 1154 (1916); and

"* * * [I]t is better to encourage negligence in the foolish than fraud in the deceitful. [Citing Larsen v. Lootens, 102 Or 579, 592, 194 P 699 (1922)] * * *." *Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571 (1945).

Fraud is defined in 2 Restatement, Contracts (1932), § 471, at 891, as follows:

" 'Fraud' * * * means
"(a) misrepresentation known to be such, or
"(b) concealment, or
"(c) non-disclosure where it is not privileged, by any person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into * * * a transaction * * *."

Comment *b* to this section provides:

"* * * [P]retense of knowledge by one who knows that he has not knowledge is as fraudulent as knowingly to misrepresent any other fact * * *."

■ Thus, statements by plaintiffs that there was a certain amount of sludge in the lagoon was a legal fraud as they either knew this was false or they consciously disregarded the fact that they had no knowledge of its truth. Also, the statements by plaintiffs or their agent that Gro-King sold for $120 per ton and Portorganite sold for $70 per ton, that in eight months of operation plaintiffs had gross sales of $12,000 and that the plant had a production capacity of ten to twelve tons per eight-hour shift, none of which statements were controverted by plaintiffs, amounted to legal fraud. *See J. C. Corbin Co. v. Preston,* 109 Or 230, 249, 218 P 917 (1923).

■ When material misrepresentations have been made, the true facts may come to light gradually. Here, the defendants had been induced to enter into a contract on the basis of material misrepresentations. If the defendants knew the true facts concerning one or several, but not all, of the misrepresentations and elected to affirm the contract, they may rescind their

affirmance of the contract at a later date when, after affirmance, they learn the truth concerning other of the remaining material misrepresentations which originally formed the basis of the bargain. Restatement, Restitution (1937), § 68, Comment *d*, at 278-79:

"* * * A person who affirms, having discovered that he has been misled by a fraudulent or material innocent misrepresentation but who does not know the full extent of the misrepresentation, can rescind the affirmance if the misrepresentation as to the facts not known to him would independently entitle him to rescind."

Defendants contend that because of the fraudulent misrepresentations on the part of the plaintiffs they did not come into the court of equity with clean hands. We agree. In *Oliphant v. French,* 256 Or 341, 347, 472 P2d 275, 278 (1970), we stated, "Equity will refuse to aid a plaintiff whose claims had their inception in his own wrongdoing [Citing with approval *Casteel v. King,* 201 Or 234, 269 P2d 529 (1954)]."

2 Pomeroy, Equity Jurisprudence (5th ed), § 400, at 100-101, states:

"* * * It is sometimes said that the remedy of specific performance rests with the *discretion* of the court; but, rightly viewed, this discretion consists mainly in applying to the plaintiff the principle, He who comes into a court of equity must come with clean hands, although the remedy, under certain circumstances, is regulated by the principle, He who seeks equity must do equity. The doctrine, thus applied, means that the party asking the aid of the court must stand in conscientious relations towards his adversary; that the transaction from which his claim arises must be fair and just, and that the relief itself must not be harsh and oppressive upon the defendant. By virtue of this prin-

ciple, a specific performance will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts. even though not actually fraudulent, by trickery, * * * or by any other means which are unconscientious * * *." (Emphasis theirs.)

In *Robinson v. Manning,* 233 Or 392, 398, 378 P2d 277 (1963), we stated, with regard to the doctrine of unclean hands, " '* * * It says that whenever a party, who, as *actor,* seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge has [sic] right, or to award him any remedy.' " (Emphasis theirs.) Id. at 398, 378 P2d at 280. Quoting *Casteel v. King,* 201 Or 234, 269 P2d 529 (1954).

Plaintiffs, by their complaint, requested a court of equity to assist them in enforcing an agreement which they had no right to enforce. The trial court erred in entering a decree in favor of plaintiffs for specific performance.

■ The plaintiffs offered evidence of their having rescinded the contract but they did not plead rescission as a defense or ask for any equitable relief. Also, defendants' affirmative answer contained a legal counterclaim for damages by reason of plaintiffs' misrepresentations. However, defendants do not appeal from that part of the trial court's decree denying them judgment; therefore, this court cannot consider the matter of defendants' legal counterclaim.

The decree is reversed and the suit dismissed.