Argued and submitted April 2, affirmed in part;
reversed in part and remanded with instructions August 18,
reconsideration denied September 29,
petition for review denied November 2, 1982 (293 Or 801)

# MAINLAND INDUSTRIES, INC.,
*Appellant - Cross-Respondent,*

*v.*

# TIMBERLAND MACHINES AND ENGINEERING CORPORATION et al,
*Respondents - Cross-Appellants.*

(No. 78-6-90, CA 19614)

649 P2d 613

Michael J. Esler, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were John W. Stephens and Esler & Schneider, Portland.

J. Pierre Kolisch, Portland, argued the cause for respondents - cross-appellants. With him on the briefs were Francine H. Gray, and Kolisch, Hartwell & Dickinson, Portland.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiff Mainland Industries, Inc. (Mainland) appeals from a trial court decree that (1) ordered defendant Miller to assign a patent to Mainland, but allowed Miller a lifetime license in the patent, and (2) denied Mainland's prayer that a constructive trust be imposed on any profits earned by defendants as a result of their wrongful use of the disputed patent. Defendants cross-appeal, contending that the trial court erred in holding that Mainland owns the patent and in holding that certain documents in defendants' possession belong to Mainland. We review *de novo*.

Mainland manufactures sawmill equipment. Defendant Miller was an employe of Mainland or of its predecessor company, Chipper Machines and Engineering Corp. (CM & E), from 1953 until 1978.[1] As Mainland's chief engineer, Miller was in charge of the firm's engineering department. His duties included inventing, designing, developing and engineering products and improving Mainland's product line.[2] He also served as Mainland's chief

---

[1] Mainland acquired Chipper Machines and Engineering Corp. in 1975 and continued its business using the same staff and plant. Unless the context requires otherwise, both corporations are referred to collectively as Mainland.

[2] The trial court found:

"Defendant Fred Miller's employment duties as plaintiff's and its predecessor's Chief Engineer included:

"(a) inventing, designing, developing, and engineering products and improvements produced and sold by those companies.

"(b) solving problems arising in connection with the use and design of the companies' products by inventing, designing, developing, and engineering improvements and modifications to prevent such problems from recurring in the future.

"(c) assigning to his subordinates in the engineering department specific projects on which to work, including inventing, designing, developing, and engineering various products, solving various problems with existing products, and improving existing products.

"(d) making it possible for those companies to reduce [manu]facturing costs for products and increase profits.

"(e) working with each company's patent attorney to secure appropriate patent protection for inventions, developments, and designs of the kind set out above in subparagraphs (a) through (d) above and assigning to the companies all rights to those patents; and,

"(f) serving as an officer and director of Chipper Machines beginning in 1973 until the acquisition by plaintiff."

troubleshooter, solving problems and handling customer complaints. When something went wrong, it was his responsibility to assign the work to another engineering department employe or to solve the problem himself.

The type of knife used in Mainland's product line is crucial. Miller realized that Mainland's headrig slabber would work better if its slotted knife could be eliminated. In the early 1970s, he began working on a new design. That effort led to a 1973 patent, which belongs to Mainland and is not in issue here. While the 1973 patent had the advantage of doubling knife life, users complained about the knife holder. Rather than assigning the problem, Miller handled it himself. He conceived a solution in 1976.[3] By changing the clamping mechanism, he designed a device that used an unslotted knife and that substantially eliminated the knife holder problem. The new design also simplified production, reduced costs and made service easier. Miller did not disclose his new design to his employer.

In late 1976 and early 1977, after Miller had conceived of the new design, Mainland received more complaints about its 1973 knife holder. When a customer in British Columbia reported problems, Miller went there to investigate. After a meeting with management, he reported that "no known solution" to the problem existed. In 1977, Miller filed an application for a patent on his new design, and a patent was granted in 1978. Because Mainland was unaware of the new design, it continued to replace its 1973 knife holders with an older model using slotted knives. The older model reduced some customer complaints, but at the expense of shorter knife life.

Miller retired from Mainland about two months prior to the issuance of the 1978 patent. He immediately began working for defendant Timberland Machines & Engineering Corporation (TM & E), a company that he and defendant Swafford, Mainland's former chief accounting

---

[3] Miller testified that he had invented the knife holder in 1976 while he was employed by Mainland. Later, he testified that he had conceived the idea in 1975 while he was employed by CM & E as officer, director and chief engineer. The trial court found that Miller was employed by Mainland or CM & E when he conceived the idea for the knife holder and that he was employed by Mainland "while he made modification in his original idea and when he prepared the drawings and made application for the patent."

officer, organized to manufacture and sell products that compete with Mainland's product line. Shortly after Miller began working for TM & E, one of Mainland's customers purchased a 1978 knife holder from TM & E as a replacement for one of Mainland's 1973 knife holders. That customer had experienced problems with the 1973 holder and believed that TM & E's 1978 design would solve those problems.

## The 1978 Patent

■ ■    The first question is whether the trial court properly awarded the 1978 patent to Mainland. Absent an agreement to the contrary, when an employe is hired to invent, or is assigned the responsibility for solving a particular problem, any resulting invention belongs to the employer.[4] When the employment relationship is general, an employe is entitled to retain any patent he procures, even though the patent relates to the employer's product line. *U. S. v. Dubilier Condenser Corp.,* 289 US 178, 187, 53 S Ct 554, 77 L Ed 1114 (1933); *Standard Parts Co. v. Peck,* 264 US 52, 58-59, 44 S Ct 239, 68 L Ed 560 (1924); *Solomons v. United States,* 137 US 342, 346, 11 S Ct 88, 34 L Ed 667 (1890); *see Blum v. Commissioner of Internal Revenue,* 183 F2d 281, 287 (3rd Cir 1950); *Marshall v. Colgate-Palmolive-Peet Co.,* 175 F2d 215, 217, 81 PQ 517 (3rd Cir 1949); *Daniel Orifice Fitting Co. v. Whalen,* 198 Cal App 2d 791, 797-98, 18 Cal Rptr 659 (1962); *see also* Restatement (Second) of Agency, § 397 (1958).

---

[4] The trial court found:

"Miller had a duty while employed by plaintiff and its predecessor to:

"(a) work on correcting the knifeholder if there were complaints about its efficiency or operation or to improve its performance.

"(b) devote the time required to a project if a patent was within reasonable contemplation.

"(c) assign work for improving the knifeholder to other trusted persons in his department if he did not have the time to do it himself.

"(d) follow up on (c) and see that the problems were solved.

"(d) disclose all ideas to his employer that were relevant to its products.

"(e) not work secretly in competition with his employer and

"(f) assign the patent on the 1978 knifeholder to plaintiff."

Defendants contend that Miller and Alfred Maede, CM & E's founder, entered into an express oral agreement under which Miller is entitled to the patent. At trial, Miller testified that before he consented to work for CM & E, Maede agreed

> "[t]hat anything that I invented on my own time, including my own materials and other facilities, would be my property alone. And following that, anything that I did in the office that was done with company time and materials, would be assigned normally to the company."

The testimony of Edmund Gurney, CM & E's former president, tended to corroborate Miller's testimony regarding the existence of some sort of an agreement. The existence of some agreement was also substantiated by Elford, who had received independent engineering assistance from Miller at Maede's suggestion. Schermerhorn, Mainland's patent attorney, testified that it was

> "[his] understanding that the patents that belonged to CM & E were those that were made on company time and at the company expense. And that any work that Fred Miller did outside of company time and at his own expense would be his own patent."

Apparently discounting the testimony of Gurney, Elford and Schermerhorn, the trial court found that "The only evidence that such an agreement ever existed is Miller's word." The court concluded that no such agreement existed and that Miller's practice of assigning other patents related to the company's business to the company belied the existence of such an agreement. The trial court also found:

> "As a professional engineer Miller was obliged to seek an express agreement with his employer if he wished to retain for himself any patents on improvements to his employer's product line, if he wished to compete with his employer on his own time, and if he wished to alter his basic duties of loyalty and as a trustee of his employer's interests."

■      We conclude that there was some sort of an oral agreement between Maede and Miller relating to when Miller was obliged to assign a patent to CM & E. In evaluating the evidence on that agreement, we look particularly to Miller's practice of assigning patents to the company. During his employment with CM & E, Miller

obtained six patents. With the exception of the 1978 patent, he had assigned every patent that directly related to the company's product line to CM & E. The practice by an employe of assigning patents to his employer constitutes persuasive evidence of a duty to assign. *See Perkins v. Standard Oil Co.,* 235 Or 7, 15, 383 P2d 107, 383 P2d 1002 (1963) (course of conduct pursued by parties to contract over course of years is reliable evidence of parties' intent); *see also Fish v. Air-O-Fan Products Corporation,* 285 F2d 208, 210, 128 PQ 4 (9th Cir 1960); *Marshall v. Colgate-Palmolive-Peet Co., supra,* 175 F2d at 217-18; *E. F. Drew & Co. v. Reinhard,* 170 F2d 679, 683, 79 PQ 252 (2d Cir 1948); *Daniel Orifice Fitting Co. v. Whalen, supra,* 198 Cal App 2d at 797-98.

■ Miller was not able to recall where he was or when he conceived of the idea for his new design, but it seemed likely to him that he thought about it at work. Miller was a salaried employe. He did not work specific hours. It was his practice to work evenings, both at and away from his employer's premises. Arguably, he developed his new design at home. However, the place where an invention is developed is not determinative of whether the employer or the employe is entitled to a patent. Under similar facts, the court stated in *Daniel Orifice Fitting Co. v. Whalen, supra*:

> " * * * It is difficult to understand how [the employe] could cut his mind off and on at will under the circumstances, i.e., think of things during the lunch hour, for example, which would constitute an improvement to plaintiff's product, and later claim such improvement as his own because he was not working for the company at that particular moment when the thought struck him. * * *" 198 Cal App at 798.

*See Crown Cork & Seal Co. v. Fankhanel,* 49 F Supp 611, 57 PQ 518 (D Md 1943); *National Development Co. v. Gray,* 316 Mass 240, 55 NE 2d 783, 788, 153 ALR 973 (1944); *Parker Rust-Proof Co. v. Allen,* 231 Mich 69, 203 NW 890 (1925). Miller conceded that he often worked on office projects at home. Mainland's other engineering employes did the same. Miller testified that, almost without exception, he was the only employe who worked with Mainland's patent attorney. He admitted that the 1973 patent idea probably came to him at home. Yet, there was no

question in his mind but that the 1973 patent belonged to Mainland. In many respects the 1978 design incorporated the same features as the 1973 design. How Miller could concede that Mainland was entitled to the 1973 patent, yet contend that the company was not entitled to the 1978 patent, is difficult to understand.

■ Defendants appear to contend that it was within Miller's sole discretion to determine whether any invention he created would belong to Mainland or to himself. In *Perkins v. Standard Oil Co., supra,* 235 Or at 16, the Supreme Court quoted with approval the words of Justice Cardozo in *Moran v. Standard Oil Co.,* 211 NY 187, 105 NE 217 (1914): "An intention to make so one-sided an agreement is not readily to be inferred." In view of the conflicting evidence concerning Miller's agreement with Maede, we cannot reasonably conclude that Maede would have put CM & E at the mercy of Miller in the manner defendants suggest. *See* 3 Corbin on Contracts 278-79 (1960). The testimony of CM & E's former president, Gurney, persuades us that, although Miller may have been entitled to patents on ideas that were unrelated to Mainland's product line, he was not entitled to patents directly related to his employer's product line. We conclude that the parties intended that Miller would assign to Mainland any patents directly related to his employer's product line. Without question, the 1978 patent was directly related to Mainland's product line.

When, as here, the evidence is both conflicting and confusing and the credibility of some of the witnesses is in issue, we accord considerable weight to the conclusions of the trial court, even though we do review *de novo. Dan Bunn, Inc., v. Brown,* 285 Or 131, 145, 590 P2d 209 (1979). We agree with the conclusions reached by the trial court on the patent question. The trial court properly awarded the patent to Mainland.

### The Miller License

Mainland contends the trial court erred in awarding Miller a lifetime license in the patent. The court explained:

" * * * This is done because Miller, had he have been truly larcenous, could have handled the matter with more

cunning and probably have succeeded. What a man carries away in his mind from a former position of employment is usually his unless there is a signed covenant not to compete for a specific (relatively short) duration. * * * Miller wanted the patent for his own. He just went about it in the wrong way. * * * This Court is not saying Miller's actions were not wrong. However, had he handled it differently, ownership might be his and it is only equitable in that light that Miller enjoy some of the fruits of his labor and recover something for his diligence in spending weekends and evenings reducing the idea to a tangible form and for paying for the expense of copyrighting it."

■     Defendants argue that the license was properly granted under equitable principles embodied in the "shop-right" doctrine. Under that doctrine, an *employer* is granted a non-assignable license to a patent when an employe who works in a general or non-inventive capacity creates an invention using the employer's time and materials. *See U. S. v. Dubilier Condenser Corp., supra*, 289 US at 188-89. The rationale for the rule is that because the patent resulted from use of the employer's property and from labor for which the employe was paid by his employer, it is equitable that the employer share in the invention. Defendants concede that no precedent exists for applying the "shop-right" doctrine in favor of an *employe*. Moreover, the facts here do not warrant application of the doctrine. As Mainland's chief engineer, Miller's duties included solving problems in the use of his employer's products. If a solution was possible, it was his duty to find it. Having already received a substantial salary from Mainland to invent, design and develop products and improvements, Miller now has no equitable claim to a license.[5]

■     An equity court has broad power to fashion an appropriate remedy. However, the court's discretion is not absolute, and it must be exercised within bounds of sound legal and equitable principles. *Ellison v. Watson,* 53 Or App 923, 930-31, 633 P2d 840, *rev den* 292 Or 109 (1981);

---

[5] Defendants rely on *Taylor v. Berkheimers, Inc.,* 48 Or App 901, 618 P2d 452, *rev den* 290 Or 271 (1980), for the proposition that, even though Miller may have acted wrongfully in appropriating the patent, he was not precluded from equitable relief. *Taylor,* however, is inapposite. There, we held that a corporate officer who had breached a fiduciary duty did not forfeit all rights to compensation for services rendered to his employer. Compensation is not an issue here.

*Shumate v. Robinson,* 52 Or App 199, 205, 627 P2d 1295 (1981).

In deciding whether Miller properly was awarded a license, we are also mindful of the maxims that equity will not aid a wrongdoer and that a party seeking equity must have clean hands. *See North Pacific Lumber Co. v. Oliver,* 286 Or 639, 650-53, 596 P2d 931 (1979). The trial court found that Miller had pursued a secret course of action in obtaining the 1978 patent. The court also found that:

" * * * Miller did not invent the '78 patent just for fun. The evidence indicates very strongly that at the time the '78 patent was formulated it was intended as a replacement part for CM&E's then existing line of products. This combined with Miller's and Swafford's taking of documents not rightfully theirs adds up to bad faith and unclean hands and this Court cannot condone such activities."

We agree with that assessment. Miller's wrongdoing was directly related to his employment contract and to his employer's product line. Under the circumstances, we conclude that the trial court was not justified in granting Miller a license. *See North Pacific Lumber Co. v. Oliver, supra,* 286 Or at 653. That portion of the trial court's decree which awarded Miller a license in the patent is vacated.

## Constructive Trust

Mainland next contends that the trial court erred in failing to impose a constructive trust upon any profits received by defendants as a result of their wrongful use of the patent. A constructive trust is a trust created by operation of law when a person, through abuse of a fiduciary or confidential relation, or by bad faith, fraud or other unconscionable conduct, has obtained property or money which he should not, in equity and good conscience, hold and enjoy. *Marston v. Myers et ux,* 217 Or 498, 509, 342 P2d 1111 (1959); *Shipe et al v. Hillman,* 206 Or 556, 565, 292 P2d 123 (1955); *Hurlbutt v. Hurlbutt,* 36 Or App 721, 724, 585 P2d 724 (1978), *rev den* 285 Or 73 (1979); *Davis v. Howard,* 19 Or App 310, 313, 527 P2d 422 (1974).

The trial court ruled in favor of defendants on Mainland's claim for damages, because the court concluded that Mainland had failed to prove any damages. That

ruling appears to have missed the point. Mainland was seeking not only damages; it also was seeking to recover profits earned by defendants as a result of their wrongful use of the patent. While plaintiff's damages and defendant's profits may be interrelated, they are nonetheless distinct concepts.

■       Equity seeks complete relief. To be completely vindicated, Mainland is entitled to recover profits earned by defendants as a result of their wrongful use of the patent. Mainland would be deprived of what was justly its, and defendants would be unjustly enriched were they permitted to retain such profits. Substantial justice will be accomplished by preventing such unjust enrichment and by requiring restitution to Mainland of profits which in equity and good conscience did not belong to defendants. *See Derenco v. Benj. Franklin Fed. Sav. and Loan,* 281 Or 533, 556-58, 577 P2d 477, *cer den* 439 US 1051 (1978); *Duplate Corp. v. Triplex Co.,* 298 US 448, 450, 56 S Ct 792, 80 L Ed 1274 (1936); *Leman v. Krentler-Arnold Co.,* 284 US 448, 455-57, 52 S Ct 238, 76 L Ed 389 (1932); *Albino v. Albino,* 279 Or 537, 550, 568 P2d 1344 (1977); *Daniel Orifice Fitting Co. v. Whalen, supra,* 198 Cal App 2d at 797 (1962) (because of the nature of the product, every sale by defendants necessarily cost plaintiff a sale); *see also* 76 Am Jur 2d Trusts, § 229.

### Accounting

■       The next question is whether Mainland is entitled to an accounting. On the record here, we conclude that such further proceedings are appropriate. There is evidence in the record that defendants earned profits as a result of their use of the patent. No suggestion has been made that any unusual difficulty would be experienced or expense incurred in arriving at an accounting for those profits. *See Stephan v. Equitable S & L Assn.,* 268 Or 544, 576-77, 522 P2d 478 (1974) (difficulty and expense considered in denying request for accounting).

### Documents

■       On cross-appeal, defendants contend that the trial court erred in finding that certain documents in defendants' possession belonged to Mainland. The documents were taken from Mainland's files when defendants Miller

and Swafford left the company. Miller contends that he took some engineering documents primarily for sentimental reasons.[6] Swafford contends that he took some accounting documents to defend against a possible tax suit.[7] The trial court found that the documents contained confidential and secret information.[8] But even if they did not, the documents *belonged* to Mainland. They were not the property of Miller or Swafford. *See Midland-Ross Corporation v. Yokana,* 185 F Supp 594, 604 (D NJ 1960) *aff'd* 293 F2d 411 (1961). The trial court correctly ordered their return.

Affirmed in part; reversed in part; that portion of the decree giving defendant Miller a license in the patent is vacated; remanded to the trial court with instructions to order an accounting of profits earned by defendants as a result of their wrongful use of the patent and to impose a constructive trust on such profits for the benefit of Mainland.

----

[6] The trial court found:

"When Miller left plaintiff's employ, he took with him engineering records owned by plaintiff. The documents contain information not generally known to plaintiff's competitors which gives plaintiff an advantage over those competitors who do not know the information. Information contained in the documents was developed at great expense to plaintiff and its predecessor. The documents would be very useful to anyone attempting to duplicate plaintiff's products or to compete with plaintiff, particularly defendants. The documents also contain information that plaintiff needs to operate its business. * * *"

[7] The trial court found:

"When defendant Swafford left plaintiff's employ, he also took financial and accounting records owned by plaintiff. These documents contain financial and cost information not generally known to plaintiff's competitors which gives plaintiff an advantage over those competitors who do not know or use it. Information contained in the documents was developed at great expense to plaintiff. The documents would be very useful to anyone attempting to duplicate plaintiff's products or to compete with plaintiff, particularly defendants. * * *"

[8] In *Prentice Dryer v. Northwest Dryer,* 246 Or 78, 424 P2d 227 (1967), cited by defendants, the alleged trade secrets were well known by competitors. 246 Or at 81-82.